1 | Jon A. Tostrud (Bar No. 199502)
2 | **TOSTRUD LAW GROUP, P.C.**
  | 1925 Century Park East, Ste. 2100
3 | Los Angeles, CA. 90067
  | Tel: (310) 278-2600
4 | Fax: (310) 278-2640
5 | Email: jtostrud@tostrudlaw.com

6 | *Attorneys for Plaintiff*

7 | [Additional Counsel on Signature Page]

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

EDWARD TROY BISHOP, Derivatively on Behalf of Nominal Defendant SOUNDHOUND AI, INC.,

      Plaintiff,

    v.

KEYVAN MOHAJER, NITESH SHARAN, JAMES HOM, DIANA SROKA, ERIC R. BALL, and LARRY MARCUS,

      Defendants,

    and

SOUNDHOUND AI, INC.,

      Nominal Defendant.

Case No. 3:25-cv-03172

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT**

**DEMAND FOR JURY TRIAL**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Edward Troy Bishop ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

SoundHound AI, Inc. ("SoundHound" or the "Company"), against current and former members of the Company's Board of Directors (the "Board") and certain of its executive officers seeking to remedy the Individual Defendants' (defined below) breach of fiduciary duties and violations of federal law. Plaintiff alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon*, inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of Defendants' publicly available documents, filings with the United States Securities and Exchange Commission ("SEC"), press releases published by and regarding SoundHound, legal filings, news reports, securities analysts' reports about the Company, the securities class action *Liles v. SoundHound AI, Inc., et al.*, Case No. 3:25-cv-02915-RFL (N.D. Cal.) (the "Securities Class Action"), and other publicly available information.

## NATURE OF THE ACTION

1.     This is a shareholder derivative action brought by Plaintiff on behalf of SoundHound against certain of its officers and current and former members of the Company's Board for breaches of their fiduciary duties between at least May 10, 2024 and March 3, 2025, inclusive (the "Relevant Period").

2.     SoundHound is a technology company that specializes in music identification, voice recognition, and natural language processing. In 2009, the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company launched its flagship product, the SoundHound mobile application, which allows users to identify songs playing around them. The Company began to expand into voice recognition and natural language processing in 2015, with the launch of its Houndify Voice AI platform.

3.     In the years that followed, SoundHound entered into key partnerships with automotive manufacturers, smart home device manufacturers, retail companies, and telecommunications companies to incorporate voice recognition technology into their products and services.

4.     In 2024, SoundHound acquired SYNQ3, a company which provides voice ordering systems in the food and beverage industry (the "SYNQ3 Acquisition"), and Amelia Holdings, Inc., a conversational AI platform (the "Amelia Acquisition" and, with the SYNQ3 Acquisition, the "Acquisitions"). In a press release, issued by SoundHound on February 27, 2025, the Company touted the Acquisitions as contributing to its "breakthrough year" in 2024, "expanding [its] leadership position in voice and conversational AI."

5.     Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company failed to effectively address material deficiencies in its internal controls over financial reporting; (ii) the material deficiencies in the

Company's internal controls hindered SoundHound's ability to account for complex transactions, including the Acquisitions; (iii) the Company's reported goodwill was materially inflated following the Amelia Acquisition; and (iv) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

6.    On March 4, 2025, SoundHound announced that it would be unable to timely file its 2024 annual report on Form 10-K (the "2024 10-K"), explaining that, "[d]ue to the complexity of accounting for the Acquisitions, the Company requires additional time to prepare the financial statements and the accompanying notes disclosed in the Company's Annual Report."

7.    On this news, the price of SoundHound's stock declined 5.86%, from a close of $10.12 per share on March 3, 2025 to a close of $9.72 per share on March 4, 2025.

8.    On March 11, 2025, the Company filed its 2024 10-K, which disclosed that material weaknesses in SoundHound's internal controls hampered its ability to account for "complex financing transactions and acquisitions."

9.    The Company additionally disclosed that, due to the material weaknesses in its internal controls, it had "recorded adjustments to correct certain errors in the preliminary purchase price allocation that existed as of [August 6, 2024

(the "Amelia Acquisition Date")]," which "*decreased the contingent earnout consideration by $5.3 million, decreased the accounts payable by $3.7 million, decreased the accrued liabilities by $1.2 million, increased deferred revenue by $0.3 million and increased the deferred tax liabilities by $0.7 million*" and "[a]s a result of the adjusted [Amelia Acquisition Date] fair value of contingent earnout consideration recognized, assets acquired and liabilities assumed, *we recorded a decrease of $9.3 million to the goodwill recognized*."[1]

10.    As a result of the foregoing, the Securities Class Action was filed against the Company and certain of its executive officers, exposing the Company to massive class-wide liability.

11.    In light of the breaches of fiduciary duty by the Individual Defendants, most of whom are the Company's current directors, the substantial likelihood of the directors' liability in this derivative action and the Securities Class Action, and that the Individual Defendants are beholden to each other based on their longstanding business and personal relationships, the Individual Defendants do not possess the requisite level of disinterestedness and independence to consider a demand to commence litigation against themselves and the other Individual Defendants on behalf of the Company. Accordingly, Plaintiff did not make a demand on the Board

---

[1] Unless otherwise indicated, all emphasis is added.

because, as further detailed herein, demand would be a futile and useless act.

## JURISDICTION AND VENUE

12.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and Section 27 of the Securities Exchange Act of 1934 (the "Exchange Act") as the claims asserted herein arise under Sections 10(b) and 21D of the Exchange Act.

13.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

14.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

15.    Additionally, diversity jurisdiction is conferred pursuant to 28 U.S.C. § 1332 as there is complete diversity between the Plaintiff and the Defendants. Plaintiff and Defendants are citizens of different states, and the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs.

16.    Venue is proper in this District pursuant to Section 27(a) of the Exchange Act and 28 U.S.C. § 1391 because SoundHound is headquartered in this District, Defendants have conducted business in this District, and a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

*Plaintiff*

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

17.    Plaintiff is, and has been at all relevant times, a shareholder of SoundHound. Plaintiff is a citizen of Maryland.

**Nominal Defendant**

18.    Nominal Defendant SoundHound is incorporated under the laws of Delaware with its principal executive offices located at 5400 Betsy Ross Drive, Santa Clara, California 95054. SoundHound's common stock is traded on the NASDAQ Stock Market ("NASDAQ") under the ticker symbol "SOUN."

**Individual Defendants**

19.    Defendant Keyvan Mohajer ("Mohajer") co-founded SoundHound and has served as its Chief Executive Officer and as a member of the Board since its inception in 2005. As of April 15, 2024, Defendant Mohajer beneficially owns 1,017,933 shares of SoundHound Class A Common Stock and 14,139,064 shares of SoundHound Class B Common Stock, worth roughly $60.2 million[2] and granting him 23.1% of the Company's total voting power.[3] Upon information and belief, Defendant Mohajer is a citizen of California.

---

[2] Valuations of the Individual Defendants' holdings of Company stock are based on the $3.97 per share closing price of SoundHound stock on April 15, 2024. Valuations of the Individual Defendants' holdings of Class B Common Stock are based on the fair market value of Class A Common Stock, as shares of Class B Common Stock may be converted into shares of Class A Common Stock.

[3] Each share of SoundHound Class B Common Stock entitles the stockholder to 10 votes.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

20.    Defendant James Hom ("Hom") co-founded SoundHound, along with Defendant Mohajer, and has served as Chief Product Officer ("CPO") since April 2022 and as a member of the Board since 2006. Prior to serving as CPO, Defendant Hom served as Vice President of Products from 2006 until April 2022. As of April 15, 2024, Defendant Hom beneficially owned 168,191 shares of SoundHound Class A Common Stock and 2,012,588 shares of SoundHound Class B Common Stock, worth roughly $8.7 million and granting him 3.3% of the Company's total voting power. Upon information and belief, Defendant Hom is a citizen of California.

21.    Defendant Diana Sroka ("Sroka") has served as a member of the Board since April 2022 and serves as a member of the Audit Committee. As of April 15, 2024, Defendant Sroka beneficially owned 145,556 shares of SoundHound Class A Common Stock, worth $577,857. Upon information and belief, Defendant Sroka is a citizen of California.

22.    Defendant Eric R. Ball ("Ball") has served as a member of the Board since March 2021 and serves as Chair of the Audit Committee. As of April 15, 2024 Defendant Ball beneficially owned 691,079 shares of SoundHound Class A Common Stock, worth roughly $2.7 million. Upon information and belief, Defendant Ball is a citizen of California.

23.    Defendant Larry Marcus ("Marcus") has served as a member of the Board since April 2009 and serves as a member of the Audit Committee. As of

April 15, 2024, Defendant Marcus beneficially owned 312,230 shares of SoundHound Class A Common Stock, worth roughly $1.2 million. Upon information and belief, Defendant Marcus is a citizen of California.

***Officer Defendant***

24.     Defendant Nitesh Sharan ("Sharan") has served as SoundHound's Chief Financial Officer ("CFO") since 2021. As of April 15, 2024, Defendant Sharan beneficially owned 616,546 shares of SoundHound Class A Common Stock, worth roughly $2.4 million. Upon information and belief, Defendant Sharan is a citizen of Oregon.

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

25.     By reason of their positions as officers and/or directors of SoundHound, and because of their ability to control the business and corporate affairs of SoundHound, the Individual Defendants owed SoundHound and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage SoundHound in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of SoundHound and its shareholders so as to benefit all shareholders equally.

26.     Each director and officer of the Company owes to SoundHound and its shareholders the fiduciary duty to exercise good faith and diligence in the

administration of the Company and in the use and preservation of its property and assets and the highest obligation of fair dealing.

27.     The Individual Defendants, because of their positions of control and authority as directors and/or officers of SoundHound, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

28.     To discharge their duties, the officers and directors of SoundHound were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

29.     Each Individual Defendant, by virtue of his or her position as a director and/or officer owed to the Company and to its shareholders the highest fiduciary duties of loyalty, good faith, and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and/or officers of SoundHound, the absence of good faith on their part, or a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

30.     As senior executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty: to ensure that SoundHound implemented and properly monitored the Company's internal controls over financial reporting; to prevent the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, financial statements, products, management, internal controls, earnings, and present and future business prospects, including the dissemination of false and/or materially misleading information regarding the Company's business, prospects, and operations; and to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful, accurate, and fairly presented information.

31.     To discharge their duties, the officers and directors of SoundHound were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the officers and directors of SoundHound were required to, among other things:

> (a) ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware and the United States, and pursuant to SoundHound's own Code of Ethics;

(b) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c) remain informed as to how SoundHound conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d) establish and maintain systematic and accurate records and reports of the business and internal affairs of SoundHound and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e) maintain, implement, and monitor an adequate and functioning system of internal legal, financial, and management controls, such that SoundHound's publicly disclosed financial information would be accurate;

(f) exercise reasonable control and supervision over the public

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g) refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h) examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and to make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

32.     Each of the Individual Defendants further owed to SoundHound and the shareholders the duty of loyalty requiring that each favor SoundHound's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

33.     At all times relevant hereto, the Individual Defendants were the agents of each other and of SoundHound and were at all times acting within the course and scope of such agency.

34.     The Individual Defendants, because of their positions of control and authority, were able to and did, directly or indirectly, exercise control over the

wrongful acts complained of herein, as well as the contents of the various public statements issued by SoundHound.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

35.    In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

36.    The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment.

37.    The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company, purposefully, recklessly, or negligently, to conceal material facts, fail to correct such misrepresentations, and violate applicable laws.

38.    In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of the

Board, each of the Individual Defendants, who are directors of SoundHound, was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

39.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in, or substantially assisted the accomplishment of that wrongdoing, and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

40.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of SoundHound and at all times acted within the course and scope of such agency.

## SOUNDHOUND'S CODE OF ETHICS

41.     The Code of Ethics states that its purpose is to:

- promote honest and ethical conduct, including the ethical handling of actual or apparent conflicts of interest between personal and professional relationships;

- promote the full, fair, accurate, timely, and understandable disclosure in reports and documents that the Company files with, or submits to, the Securities and Exchange Commission (the "SEC"), as well as in other public communications made by or on behalf of the Company;

- promote compliance with applicable governmental laws, rules, and regulations;

- deter wrongdoing; and

- require prompt internal reporting of breaches of, and accountability for adherence to, this Code.

42.　　The Code of Ethics applies to "all directors, officers, and employees of the Company," and violations of the Code of Ethics will lead to "disciplinary or preventive action . . . up to and including dismissal or, in the event of criminal or other serious violations of law, notification of the SEC or other appropriate law enforcement authorities."

43.　　In a section titled "Honest, Ethical and Fair Conduct," the Code of Ethics states, in pertinent part:

- Act with integrity, including being honest and candid while still maintaining the confidentiality of the Company's information where required or in the Company's interests.

- Observe all applicable governmental laws, rules, and regulations.

- Comply with the requirements of applicable accounting and auditing standards, as well as Company policies, in order to maintain a high standard of accuracy and completeness in the Company's financial records and other business-related information and data.

- Adhere to a high standard of business ethics and not seek competitive advantage through unlawful or unethical business practices.

* * *

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

- Protect the assets of the Company and ensure their proper use.

* * *

- Avoid conflicts of interest, wherever possible, except under guidelines or resolutions approved by the Board of Directors (or the appropriate committee of the Board).

44.     In a section titled "Disclosure," the Code of Ethics states:

The Company strives to ensure that the contents of and the disclosures in public communications and in the reports and documents that the Company files with the SEC shall be full, fair, accurate, timely, and understandable in accordance with applicable disclosure standards, including standards of materiality, where appropriate. Each person must:

- not knowingly misrepresent, or cause others to misrepresent, facts about the Company to others, whether within or outside the Company, including to the Company's independent auditors, governmental regulators, self-regulating organizations, and other governmental officials, as appropriate; and

- in relation to his or her area of responsibility, properly review and critically analyze proposed disclosure for accuracy and completeness.

In addition to the foregoing, the Chief Executive Officer and Chief Financial Officer of the Company and each subsidiary of the Company (or persons performing similar functions), and each other person that typically is involved in the financial reporting of the Company must familiarize himself or herself with the disclosure requirements applicable to the Company as well as the business and financial operations of the Company.

Each person must promptly bring to the attention of the Chairman of the Audit Committee of the Company's Board of Directors (or the Chairman of the Company's Board of Directors if no Audit Committee exists) any information he or she may have concerning (a) significant deficiencies in the design or operation of internal and/or disclosure controls which could adversely affect the Company's ability to record,

17

process, summarize, and report financial data or (b) any fraud, whether or not material, that involves management or other employees who have a significant role in the Company's financial reporting, disclosures, or internal controls.

It is the Company's obligation and policy to comply with all applicable governmental laws, rules, and regulations. It is the personal responsibility of each person to, and each person must, adhere to the standards and restrictions imposed by those laws, rules, and regulations, including those relating to accounting and auditing matters.

## **SOUNDHOUND'S AUDIT COMMITTEE CHARTER**

45.     Pursuant to SoundHound's Audit Committee Charter, the purpose of the Audit Committee is:

to assist the Board in monitoring: (1) the integrity of the annual, quarterly, and other financial statements of the Company, (2) the independent auditor's qualifications and independence, (3) the performance of the Company's independent auditor, and (4) the compliance by the Company with legal and regulatory requirements.

46.     In a subsection titled "Financial Statement and Disclosure Matters," the Audit Committee Charter tasks the Audit Committee with the following responsibilities:

- Meet with the independent auditor prior to the audit to review the scope, planning, and staffing of the audit.

- Review and discuss with management and the independent auditor the annual audited financial statements, and recommend to the Board whether the audited financial statements should be included in the Company's Annual Report on Form 10-K (or the annual report to shareholders if distributed prior to the filing of the Form 10-K).

- Review and discuss with management and the independent auditor the Company's quarterly financial statements prior to the filing of its Form

18
VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

10-Q, including the results of the independent auditor's review of the quarterly financial statements.

- Discuss with management and the independent auditor, as appropriate, significant financial reporting issues and judgments made in connection with the preparation of the Company's financial statements, including:

  o any significant changes in the Company's selection or application of accounting principles;

  o the Company's critical accounting policies and practices;

  o all alternative treatments of financial information within GAAP that have been discussed with management and the ramifications of the use of such alternative accounting principles;

  o any major issues as to the adequacy of the Company's internal controls and any special steps adopted in light of material control deficiencies; and

  o any material written communications between the independent auditor and management, such as any management letter or schedule of unadjusted differences.

- Discuss with management the Company's earnings press releases generally, including the use of "pro forma" or "adjusted" non-GAAP information, and any financial information and earnings guidance provided to analysts and rating agencies. Such discussion may be general and include the types of information to be disclosed and the types of presentations to be made.

- Discuss with management and the independent auditor the effect on the Company's financial statements of (i) regulatory and accounting initiatives and (ii) off-balance sheet structures.

- Discuss with management the Company's major financial risk exposures and the steps management has taken to monitor and control such exposures, including the Company's risk

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

assessment and risk management policies.

- Discuss with the independent auditor the matters required to be discussed by Statement on Auditing Standards No. 61 relating to the conduct of the audit, including any difficulties encountered in the course of the audit work, any restrictions on the scope of activities or access to requested information, and any significant disagreements with management.

- Review disclosures made to the Audit Committee by the Company's Chief Executive Officer and Chief Financial Officer (or individuals performing similar functions) during their certification process for the Form 10-K and Form 10-Qs about any significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting and any fraud involving management or other employees who have a significant role in the Company's internal control over financial reporting.

47.    In a subsection titled "Compliance Oversight Responsibilities," the Audit Committee Charter states, in pertinent part, that the Audit Committee shall "[i]nquire and discuss with management the Company's compliance with applicable laws and regulations and with the Company's Code of Ethics in effect at such time, if any, and, where applicable, recommend policies and procedures for future compliance."

48.    In the same subsection, the Audit Committee Charter states that the Audit Committee shall "[e]stablish procedures . . . for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or reports which raise material issues regarding the Company's financial statements or accounting policies."

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

## SUBSTANTIVE ALLEGATIONS

*Background*

49.     SoundHound is a technology company that specializes in music identification, voice recognition, and natural language processing. In 2009, the Company launched its flagship product, the SoundHound mobile application, which allows users to identify songs playing around them. The Company began to expand into voice recognition and natural language processing in 2015, with the launch of its Houndify Voice AI platform.

50.     In the years that followed, SoundHound entered into key partnerships with automotive manufacturers, smart home device manufacturers, retail companies, and telecommunications companies to incorporate voice recognition technology into their products and services.

51.     On April 28, 2022, SoundHound went public via merger with a special purpose acquisition company and began trading on the NASDAQ under the ticker symbol "SOUN."

52.     In 2024, the Company completed two significant acquisitions in the voice recognition space. Specifically, on January 3, 2024, SoundHound acquired all of the issued and outstanding equity of SYNQ3, a company which provides voice ordering systems in the food and beverage industry, "for total preliminary purchase consideration of $17.0 million," including "$3.9 million in cash paid and 5,755,910

in shares of [SoundHound's] Class A Common stock," additionally agreeing "to pay up to $0.8 million in cash and 1,434,936 in shares of [SoundHound's] Class A Common Stock . . . upon the achievement of specified future milestones."[4]

53.    On August 6, 2024 SoundHound acquired all the capital stock of Amelia Holdings, Inc., a conversational AI platform, for "approximately $80.0 million of consideration, consisting of $10.0 million of cash and 13,084,112 shares of [SoundHound's] Class A Common Stock," additionally agreeing "to issue up to 16,822,429 shares of its Class A Common Stock . . . to the sellers based on the achievement of certain revenue targets for 2025 and 2026."[5]

54.    In a press release, issued by SoundHound on February 27, 2025, the Company touted the Acquisitions as contributing to its "breakthrough year" in 2024, "expanding [its] leadership position in voice and conversational AI."

55.    Throughout the Relevant Period, the Individual Defendants issued statements that were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company failed to effectively address material deficiencies in its internal controls over financial reporting; (ii) the material deficiencies in the

---

[4]https://www.sec.gov/ix?doc=/Archives/edgar/data/0001840856/000184085624000019/soun-20240331.htm

[5]https://www.sec.gov/ix?doc=/Archives/edgar/data/0001840856/000184085624000028/soun-20240630.htm

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Company's internal controls hindered SoundHound's ability to account for complex transactions, including the Acquisitions; (iii) the Company's reported goodwill was materially inflated following the Amelia Acquisition; and (iv) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

***Materially False and Misleading Statements***

56.    The Relevant Period begins on May 10, 2024, the day after an earnings call, hosted by SoundHound post-market on May 9, 2024, to discuss the Company's first quarter 2024 financial results (the "1Q24 Earnings Call"). During the 1Q24 Earnings Call, Defendant Sharan stated that, "[w]ith our recent acquisitions, SYNQ3, now fully in the mix, the benefits of integrating this pioneering restaurant tech organization with our years of voice AI innovations are clear. And the breadth of coverage we now have in the restaurant sector is so exciting and showing up in overflowing customer activity."

57.    Also on May 10, 2024, the Company filed a quarterly report on Form 10-Q with the SEC (the "1Q24 10-Q"). The 1Q24 10-Q disclosed material weaknesses in its internal controls over financial reporting "related to the control environment as the Company lacked sufficient oversight of activities related to its internal control over financial reporting due to a lack of appropriate level of

experience and training commensurate with its financial reporting requirements,"

but stated the following with respect to the Company's purported efforts to

remediate the deficiencies:

**Management's Plan to Remediate the Material Weaknesses**

The following remediation actions are currently being implemented and are in progress:

- Engaged a third party to perform a risk assessment that includes the identification and walkthrough of key business processes and conducting design and operational control testing to address key risks.

- Completed a segregation of duties assessment identifying key conflicts and mitigating controls.

- Initiated the design and implementation of a Segregation of Duties automated tool for our Enterprise Resource Planning (ERP) system. Additionally, we have initiated the design and implementation of similar controls for the remaining financially relevant applications. Improvements have been implemented in tool utilization to strengthen the segregation of duties.

- Initiated the design and implementation of controls related to the review of Service Organization Control reports, which cover program change management and computer operations for many of the applications that we rely on for financial reporting.

- Developed policies and procedures for the quarterly user access review of all users with access to the financially relevant systems and then implemented the quarterly user access review for one design cycle.

- Initiated the design and implementation of the controls related to review and approval of complex financing transactions.

- Completed the implementation of an automated month and quarter-end accounting close workflow tool to facilitate the review and support of key financial close process controls.

- The Company plans to hire personnel with expertise in internal controls.

58. On August 8, 2024, SoundHound issued a press release titled "SoundHound AI Acquires Amelia, Significantly Expanding its Scale and Reach In Conversational AI Across New Verticals and Hundreds and Enterprise Brands." Therein, the Company stated, in pertinent part:

SoundHound [. . .] today announced the acquisition of Amelia, a leading enterprise AI software company. The business combination positions SoundHound AI as the foremost provider of voice and conversational generative AI, with reach across multiple industries – including retail, financial services, healthcare, automotive, smart devices, restaurants, and more.

The companies will bring together decades of experience in conversational AI – and highly complementary product portfolios – to offer best-in-class, scalable customer service support to a vast spectrum of businesses. These include some of the very largest multinational enterprise brands, top 15 global banks, and Fortune 500 organizations, with the combined company spanning nearly 200 marquee customers.

For SoundHound AI, the deal marks a significant and strategic expansion of its existing customer service pillar, adding breadth and depth to a division that has seen substantial growth amid the accelerated adoption of voice and conversational generative AI solutions. The acquisition positions the company at the center of this burgeoning space, as enterprise spending on generative AI is forecast to gather more momentum, reaching between $175 billion and $250 billion by 2027 (McKinsey, June 2024). Customer service is identified as a key area for disruption.

59. Also on August 8, 2024, the Company issued a press release,

announcing its second quarter 2024 financial results, which stated the following, in pertinent part:

> "This has been a milestone quarter, with strong customer momentum across all of our key industries – including several new global brands," said [Defendant] Mohajer[.] "And ***today we announced a significant acquisition that will expand SoundHound's reach across multiple new enterprise verticals.*** We believe the demand for voice and conversational AI is increasing and are committed to strengthening our leadership position in this growing market."
>
> *  *  *
>
> We continued to realize strong growth in the second quarter while meaningfully improving our capital structure," said [Defendant] Sharan[.] "This is allowing us to further accelerate our organic business ***while capitalizing on high-impact M&A. Today's acquisition of Amelia is a key step towards harnessing the huge growth potential in conversational AI and helps us scale even faster."***

60.    During an earnings call, hosted by the Company on the same day (the "2Q24 Earnings Call"), Defendant Mohajer stated, in pertinent part:

> Before getting into the quarter, I wanted to talk about the announcement we made this morning to acquire a conversational AI leader, Amelia. This transaction is a natural extension of our strategy, and we saw a great opportunity to partner with a company that we believe will accelerate our mission of voice-enabling the world with conversational intelligence. Our vision has always been to create a conversational AI platform that exceeds human capabilities, delivers value and delights end users, creates an ecosystem with billions of products, and enables innovation and monetization opportunities for product creators. Today's announcement is a continuation of that path and now is the time for such a bold move.

61.    Later during the 2Q24 Earnings Call, Defendant Sharan stated, in pertinent part:

Today, we announced and [Defendant Mohajer] noted earlier, our acquisition of conversational AI leader Amelia. Let me spend a minute explaining how we think about M&A.

First, we believe having a programmatic M&A approach can be value-generating. Our acquisition philosophy stems from our overall strategy and vision, which is to voice-enable the world with conversational intelligence and transform the next wave of how humans will interact with technology, increasingly with voice and natural conversations.

* * *

The primary filters we have been using to select appropriate acquisition targets have been, one, does it fit within our long-term strategy? Two, will it amplify or accelerate our pathway to realize that strategy? Three, can we effectively operationalize it and drive meaningful synergies? And four, can we buy it at the right price, appreciating the risks that inherently come from such transactions? Amelia checked those boxes for us. While it would be a meaningful acquisition with a lot of complementarity, we don't take the integration effort lightly and know it will take some time to get it right, but the prize together was too attractive to bypass in our opinion, especially with the enterprise traction and demands we have been seeing in the marketplace. We just announced this today, so it's still quite early and we know there will be questions, so please note that we plan to share more and dive much deeper on the opportunity we see.

62.    On August 9, 2024, the Company filed a quarterly report Form 10-Q with the SEC (the "2Q24 10-Q"), which repeated substantially the same statement regarding the material weakness in SoundHound's internal controls over financial reporting that was contained in the 1Q24 10-Q.

63.    During an earnings call, hosted by the Company on November 12, 2024 (the "3Q24 Earnings Call," Defendant Mohajer stated, in pertinent part:

Moving on to our AI agent customer service portfolio. I'm very pleased

with the way we have grown this business over the course of this year, winning new logos organically, expanding with existing customers, growing our ecosystem of partners and making smart acquisitions. We have now expanded our enterprise customer brands deep into some major industries like financial services and healthcare among others. And we see opportunities in our pipeline for new verticals such as energy and going deeper into retail.

64.     Also on November 12, 2024, SoundHound filed a quarterly report on Form 10-Q with the SEC (the "3Q24 10-Q"), which repeated substantially the same statement regarding the material weakness in SoundHound's internal controls over financial reporting that was contained in the 1Q24 10-Q and the 2Q24 10-Q. Further, the 3Q24 10-Q reported $111.7 million in goodwill as of September 30, 2024.

65.     The statements identified above were materially false and misleading and omitted to state material adverse facts necessary to make the statements not misleading because they failed to disclose that: (i) the Company failed to effectively address material deficiencies in its internal controls over financial reporting; (ii) the material deficiencies in the Company's internal controls hindered SoundHound's ability to account for complex transactions, including the Acquisitions; (iii) the Company's reported goodwill was materially inflated following the Amelia Acquisition; and (iv) as a result of the foregoing, positive statements concerning the Company's business, operations, and prospects were materially false and misleading and lacked a reasonable basis at all relevant times.

*The Truth Emerges*

66.    On March 4, 2025, the Company filed a notification with the SEC, disclosing that it would be unable to timely file its 2024 10-K. Therein, SoundHound stated, in pertinent part:

> As previously disclosed, on January 3, 2024, SoundHound AI, Inc. (the "Company") completed the acquisition of Synq3, Inc. in a cash and stock transaction (the "SYNQ3 Acquisition"), and on August 7, 2024, the Company completed the acquisition of Amelia Holdings, Inc. in a cash and stock transaction (together with the SYNQ3 Acquisition, the "Acquisitions"). ***Due to the complexity of accounting for the Acquisitions, the Company requires additional time to prepare the financial statements and the accompanying notes disclosed in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2024 (the "Form 10-K"). Accordingly, the Company has determined that it is unable to file the Form 10-K without unreasonable effort or expense. As previously disclosed, the Company has identified material weaknesses in its internal control over financial reporting. These material weaknesses continue to exist as of December 31, 2024.*** The Company expects to file its Form 10-K within the fifteen-day period provided under Rule 12b-25, no later than by March 18, 2025

67.    On this news, the price of SoundHound's stock declined 5.86%, from a close of $10.12 per share on March 3, 2025 to a close of $9.72 per share on March 4, 2025.

68.    On March 11, 2025, the Company filed its 2024 10-K, which disclosed that material weaknesses in SoundHound's internal controls hampered its ability to account for "complex financing transactions and acquisitions." Specifically, the 10-K stated, in pertinent part:

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rules 13a-15(f) and 15d15(f) under the Securities Exchange Act of 1934, as amended). Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2024. In making this assessment, our management used the criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of a company's annual or interim financial statements may not be prevented or detected on a timely basis. The Company did not maintain an effective control environment as it lacked sufficient oversight of activities related to its internal control over financial reporting due to a lack of appropriate level of experience and training commensurate with its financial reporting requirements. ***Further, due to rapid business growth, changes to existing controls or the implementation of new controls have not been sufficient to respond to changes to the risks of material misstatement to financial reporting, which resulted in the Company, including the SYNQ3 and Amelia entities which were acquired during 2024, not designing and maintaining effective controls related to substantially all accounts and disclosures. These material weaknesses contributed to the following additional material weaknesses as of December 31, 2024:***

- ***The Company did not design and maintain effective controls related to the identification of and accounting for certain non-routine, unusual or complex transactions, including the accounting for complex financing transactions and acquisitions.***

69.    Further, with respect to the Amelia Acquisition, the 2024 10-K stated, in pertinent part:

During the year ended December 31, 2024, we recorded measurement period adjustments to increase the cash consideration by $12.8 thousand, to decrease the accounts receivable by $0.2 million, increase the accrued liabilities by $0.9 million due to additional payroll taxes identified, to decrease the non-current income tax liabilities by $1.8

million due to the change of pre-acquisition tax exposures subsequent to the acquisition. As a result of the adjusted acquisition-date fair value of cash consideration, assets acquired and liabilities assumed, we recorded a decrease of $0.7 million to the goodwill recognized. The measurement period adjustments were recorded in the consolidated financial statements as of and for the year ended December 31, 2024 and were made to reflect facts and circumstances that existed as of the Amelia Acquisition Date. ***In addition to the measurement period adjustments, we also recorded adjustments to correct certain errors in the preliminary purchase price allocation that existed as of the [Amelia Acquisition Date] during the year ended December 31, 2024, which decreased the contingent earnout consideration by $5.3 million, decreased the accounts payable by $3.7 million, decreased the accrued liabilities by $1.2 million, increased deferred revenue by $0.3 million and increased the deferred tax liabilities by $0.7 million. As a result of the adjusted acquisition-date fair value of contingent earnout consideration recognized, assets acquired and liabilities assumed, we recorded a decrease of $9.3 million to the goodwill recognized.*** The identified error related to the contingent earnout consideration had an immaterial impact to the change in fair value from the acquisition date through September 30, 2024, which would have been recorded in change in fair value of contingent acquisition liabilities in the consolidated statements of operations and comprehensive loss.

## DAMAGE TO THE COMPANY

70.    As a direct and proximate result of the misconduct detailed above, the Company has incurred and will continue to incur significant financial losses, including but not limited to, the costs of defending against and incurring potential class-wide liability in the Securities Class Action.

71.    These damages also include the costs of remediating deficiencies in the Company's procedures and controls, compensation and benefits paid to current and former members of the Board and Company executives, who breached their

fiduciary duties to SoundHound, and reputational harm and loss of goodwill.

72.    Furthermore, as a direct and proximate result of the misconduct detailed herein, SoundHound has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock in the future due to the Company's misrepresentations and management's breaches of fiduciary duties and unjust enrichment.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

73.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress injuries suffered and to be suffered as a direct and proximate result of the breach of fiduciary duties by the Individual Defendants.

74.    SoundHound is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would otherwise not have.

75.    Plaintiff is a current shareholder of SoundHound and was a continuous shareholder of the Company during the period of the Individual Defendants' wrongdoing alleged herein. Plaintiff will adequately and fairly represent the interests of the Company in enforcing and prosecuting its rights and retained counsel competent and experienced in derivative litigation.

76.    A pre-suit demand on the Board of SoundHound is futile and, therefore, excused. At the time this action was commenced, the five-member Board

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

was comprised of Defendants Mohajer, Hom, Sroka, Ball, and Marcus (the "Director Defendants"). Accordingly, Plaintiff is only required to show that three Directors cannot exercise independent objective judgment about whether to bring this action or whether to vigorously prosecute this action. As set forth below, all of the Board's current members are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action, including because they face a substantial likelihood of liability, and so demand on the Board to institute this action is not necessary because such a demand would have been a futile act.

77.    The Director Defendants either knew or should have known of the false and misleading statements that were issued on the Company's behalf and took no steps in a good faith effort to prevent or remedy that situation.

78.    Each of the Director Defendants approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from the Company's stockholders or recklessly and/or with gross negligence disregarded the wrongs complained of herein and are therefore not disinterested parties.

79.    Moreover, the Director Defendants willfully ignored, or recklessly failed to inform themselves of, the obvious problems with the Company's internal controls, practices, and procedures and failed to make a good faith effort to correct

the problems or prevent their recurrence.

80.    Defendants Mohajer and Hom are not disinterested or independent and are therefore incapable of considering a demand. Defendants Mohajer and Hom co-founded the Company together, Defendant Mohajer has served as the CEO from SoundHound's inception, and Defendant Hom has served as the Company's Chief Product Officer since 2022 and as its Vice President of Products from 2006 until 2022. Defendants Mohajer and Hom cannot be reasonably expected to consider with disinterestedness whether to sue fellow directors of a company that they founded and have helped to build from inception.

81.    Further, Defendant Mohajer is not disinterested or independent because he is named as a defendant, and faces significant personal liability, in the Securities Class Action based on substantially the same wrongdoing as alleged herein, specifically issuing materially false and misleading statements during the Relevant Period.

82.    Defendants Ball, Marcus, and Sroka serve on the Company's Audit Committee (the "Audit Defendants") and, pursuant to the Audit Committee Charter, were specifically charged with the responsibility to assist the Board in fulfilling its oversight responsibilities related to, *inter alia*, financial accounting and reporting, the underlying internal controls and procedures over financial reporting, the audits of the financial statements, and oversight with respect to the Company's risk

management function and its legal and regulatory compliance. At all relevant times, however, the Audit Defendants breached their fiduciary duty to the Company by failing to prevent, correct, or inform the Board of the issuance of material misstatements and omissions regarding the Company's business and the adequacy of its internal controls as alleged above. Therefore, the Audit Defendants cannot independently consider any demand to sue themselves for breaching their fiduciary duties to the Company, as that would expose them to substantial liability and threaten their livelihoods.

83.     The Director Defendants, as members of the Board, were and are subject to the Company's Code of Conduct. The Code of Conduct goes well beyond the basic fiduciary duties required by applicable laws, rules, and regulations, requiring the Directors to also adhere to the Company's standards of business conduct. The Director Defendants violated the Code of Conduct because they knowingly or recklessly participated in making and/or causing the Company to make the materially false and misleading statements alleged herein. Because the Director Defendants violated the Code of Conduct, they face a substantial likelihood of liability for breaching their fiduciary duties, and therefore demand upon them is futile.

84.     All of the Board's current members derive substantial revenue from the Company, control the Company, and are indebted to each other. These conflicts

of interest have precluded the Board's current members from calling into question the Director Defendants' conduct. Importantly, none of the Board's current members have taken remedial action to redress the conduct alleged herein. For instance, none of the Board's current members have sought to enforce the Company's Clawback Policy, which provides for "the mandatory recovery of erroneously awarded incentive-based compensation from our current and former executive officers . . . in the event that we are required to prepare an accounting restatement."

85.    The Director Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the directors can claim exculpation from their violations of duty pursuant to the Company's charter. As a majority of the directors face a substantial likelihood of liability, they are self-interested in the transactions challenged herein. They cannot be presumed to be capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

86.    The acts complained of herein constitute violations of fiduciary duties owed by SoundHound's officers and directors, and these acts are incapable of ratification.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

87.     The Individual Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers' liability insurance if they caused the Company to purchase it for their protection with corporate funds i.e., monies belonging to the stockholders of SoundHound. If there is a directors' and officers' liability insurance policy covering the Individual Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Individual Defendants, known as, inter alia, the "insured-versus-insured exclusion." As a result, if the Director Defendants were to sue themselves or certain officers of SoundHound, there would be no directors' and officers' insurance protection. Accordingly, the Director Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director Defendants is futile and, therefore, excused.

88.     If there is no directors' and officers' liability insurance, then the directors will not cause SoundHound to sue the Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event as well.

89.     Thus, for all of the reasons set forth above, all of SoundHound's

current directors are unable to consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

## COUNT I

### Against the Individual Defendants
### For Breach of Fiduciary Duty

90.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

91.    The Individual Defendants owed the Company fiduciary obligations. By reason of their fiduciary relationships, the Individual Defendants owed the Company the highest obligation of good faith, fair dealing, loyalty, and due care.

92.    The Individual Defendants violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, and good faith.

93.    The Individual Defendants engaged in a sustained and systematic failure to properly exercise their fiduciary duties. Among other things, the Individual Defendants breached their fiduciary duties of loyalty and good faith by failing to implement and monitor adequate internal controls over the Company's financial reporting and, as a consequence, issuing or permitting the issuance of materially false and misleading statements in the Company's SEC filings and other public disclosures. These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

94.    As a direct and proximate result of the Individual Defendants' failure to fulfill their fiduciary obligations, the Company has sustained significant damages.

95.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company. As a direct and proximate result of the Individual Defendants' breach of their fiduciary duties, the Company has suffered damage, not only monetarily, but also to its corporate image and goodwill. Such damage includes, among other things, costs incurred in defending itself in the Securities Class Action, exposing the Company to millions of dollars in potential class-wide damages in the Securities Class Action, and damage to the share price of the Company's stock, resulting in an increased cost of capital, and reputational harm.

## COUNT II

### Against the Individual Defendants for Aiding and Abetting Breach of Fiduciary Duty

96.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

97.    By encouraging and accomplishing the illegal and improper transactions alleged herein and concealing them from the public, the Individual Defendants have each encouraged, facilitated, and advanced their breach of their fiduciary duties. In so doing, the Individual Defendants have each aided and abetted,

conspired, and schemed with one another to breach their fiduciary duties, waste the Company's corporate assets, and engage in the ultra vires and illegal conduct complained of herein.

98.    Plaintiff, on behalf of SoundHound, has no adequate remedy at law.

## COUNT III

### Against the Individual Defendants
### For Unjust Enrichment

99.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

100.    By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, SoundHound.

101.    The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from SoundHound that were tied to the performance or artificially inflated valuation of SoundHound, or received compensation that was unjust in light of the Individual Defendants' bad faith conduct.

102.    Plaintiff, as a shareholder and a representative of SoundHound, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits and other compensation procured by the Individual

Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

103.   Plaintiff, on behalf of SoundHound, has no adequate remedy at law.

## COUNT IV

**Against the Individual Defendants
For Waste of Corporate Assets**

104.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

105.   The wrongful conduct alleged regarding the issuance of false and misleading statements was continuous, connected, and on-going throughout the time period in issue.  It resulted in continuous, connected, and ongoing harm to the Company.

106.   As a result of the misconduct described above, the Individual Defendants wasted corporate assets by, *inter alia*: (i) paying and collecting excessive compensation and bonuses; and (ii) incurring potentially millions of dollars of legal liability and/or legal costs, including defending the Company and its officers against the Securities Class Action.

107.   As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

108.   Plaintiff, on behalf SoundHound, has no adequate remedy at law.

## COUNT V

**Against Defendants Mohajer and Sharan for Contribution Under Section 10(b) and 21D of the Securities Exchange Act of 1934**

109.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.   SoundHound, along with Defendants Mohajer and Sharan (the "Officer Defendants"), are named as defendants in the Securities Class Action, which asserts claims under the federal securities laws for violations of Sections 10(b) and 20(a) of the Exchange Act, and SEC Rule 10b-5 promulgated thereunder.

111.   The Securities Class Action alleges that the class members relied, directly or indirectly, upon the false and misleading statements and omissions, as alleged herein, in purchasing SoundHound securities. The Securities Class Action further alleges that, as a direct and proximate result, the class members suffered damages because the value of their investments were artificially inflated by the false and misleading statements and omissions, they purchased such securities at the artificially inflated prices, and the value of their investments fell when the truth was eventually revealed, causing economic losses to the class members.

112.   If and when the Company is found liable in the Securities Class Action for these violations of the federal securities laws, the Company's liability will be in whole or in part due to the Officer Defendants' willful and/or reckless violations of their obligations as officers and/or directors of the Company.

113.   The Officer Defendants, because of their positions of control and

authority as senior executive officers of the Company, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of the Company, including the wrongful acts complained of herein and in the Securities Class Action.

114.    Accordingly, the Officer Defendants are liable under 15 U.S.C. § 78j(b), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. § 78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

115.    As such, the Company is entitled to receive all appropriate contribution or indemnification from the Officer Defendants.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment as follows:

A.    Awarding money damages against all Individual Defendants, jointly and severally, for all losses and damages suffered as a result of the acts and transactions complained of herein, together with pre-judgment interest, molded in a fashion to ensure the Individual Defendants do not participate therein or benefit thereby;

B.    Directing all Individual Defendants to account for all damages caused by them and all profits and special benefits and unjust enrichment they have obtained as a result of their unlawful conduct, including all salaries, bonuses, fees,

stock awards, options and common stock sale proceeds, and imposing a constructive trust thereon;

C.    Directing the Company to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to:

• strengthening the Board's supervision of operations and compliance with applicable state and federal laws and regulations;

• strengthening the Company's internal reporting and financial disclosure controls;

• developing and implementing procedures for greater shareholder input into the policies and guidelines of the Board; and

• strengthening the Board's internal operational control functions;

D.    Awarding costs and disbursements of this action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

1  Dated: April 8, 2025

2                                    **TOSTRUD LAW GROUP, P.C.**

3                                    By: /s/ Jon A. Tostrud
                                          Jon A. Tostrud
4                                    1925 Century Park East, Ste. 2100
                                     Los Angeles, CA. 90067
5                                    Tel: (310) 278-2600
                                     Fax: (310) 278-2640
6                                    Email: jtostrud@tostrudlaw.com

7                                    **RIGRODSKY LAW, P.A.**
                                     Timothy J. MacFall
8                                    Samir Aougab
                                     825 East Gate Boulevard
9                                    Suite 300
                                     Garden City, NY 11530
10                                   Telephone: (516) 683-3516
                                     Email: tjm@rl-legal.com
11                                   Email: sa@rl-legal.com

12                                   **GRABAR LAW OFFICES**
                                     Joshua H. Grabar
13                                   One Liberty Place
                                     1650 Market Street, Suite 3600
14                                   Philadelphia, PA 19103
                                     Tel: (267) 507-6085
15                                   Email: jgrabar@grabarlaw.com

16                                   ***Attorneys for Plaintiff***

17

18

19

20

21

22

23

24

25

26

27

28
─────────────────────────────────────
                                45

Docusign Envelope ID: E1AC777E-E468-4737-BC37-D548F8737FE0

## <u>VERIFICATION OF EDWARD TROY BISHOP</u>

I, Edward Troy Bishop, am a plaintiff in this action. I have reviewed the allegations made in the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. As to those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: 4/2/2025

Edward Troy Bishop